UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

GASTON CORNU-LABAT,

              Plaintiff,

       v.

MEHDI MERRED, an individual;
ERIC BAKKE and THOMAS CLARK,
individually and in their
official capacities as police
officers; the CITY OF QUINCY,
WASHINGTON, a Washington
Municipal Corporation and
political subdivision of the
State of Washington, and GRANT
COUNTY SHERIFF'S OFFICE, a
Washington municipal corporation
and political subdivision of the
State of Washington,

              Defendants.

NO. CV-11-0080-EFS

**ORDER DENYING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT,
AND GRANTING THE QUINCY
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

On the evening of December 4, 2010, Plaintiff Gaston Cornu-Labat was watching his son's high school varsity basketball game in the Quincy High School gymnasium. Dr. Cornu-Labat was unable to congratulate his son following his team's win because during the game Dr. Cornu-Labat was arrested for being in the same gymnasium as the daughter of Defendant Mehdi Merred, who had obtained a temporary order for protection ("protection order") against Dr. Cornu-Labat. Although the arresting officers erroneously believed that the protection order prohibited Dr.

ORDER ~ 1

Cornu-Labat from being within 250 feet of the school, the Court grants summary judgment in the arresting officers' and the City of Quincy's ("Quincy") favor for the reasons set forth below.

**A.    Background**[1]

Dr. Cornu-Labat, a surgeon, relocated to Quincy in 2007 after being hired by the Quincy Valley Medical Center (QVMC) to serve as its chief of medical staff.    During his employment, Dr. Cornu-Labat became concerned that QVMC did not comply with fire codes, did not respond to patients' needs, and fostered a workplace culture that prevented staff from reporting problems or suggesting improvements.    ECF No. 84-11 ¶¶ 4-5.  Dr. Cornu-Labat shared his concerns with Mr. Merred, who was QVMC's Chief Executive Officer, the QVMC commissioners, and others through letters, the local newspaper, and the Internet.  *Id.* ¶¶ 6-8.  Dr. Cornu-Labat's contract with QVMC was not extended.    And because of Dr. Cornu-Labat's continued remarks about Mr. Merred's inability to effectively lead QVMC, Mr. Merred asked the QVMC's attorneys to obtain a protection order preventing Dr. Cornu-Labat from contacting him.    *Id.* ¶ 10.

---

[1]    When considering the motions and drafting this background section, the Court 1) took as true all undisputed facts, ECF No. 96 & 104; 2) did not weigh the evidence or assess credibility; and 3) did not accept assertions that were flatly contradicted by the record.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).    Agreed facts are not supported by a citation to the record, while disputed facts and quotations are supported by a citation.

ORDER ~ 2

On November 3, 2010, during an ex parte proceeding, the Grant County District Court issued a protection order in Mr. Merred's favor against Dr. Cornu-Labat.  The issued protection order was set forth on the Grant County District Court's standard protection order form, and was completed as follows:

| | |
|---|---|
| ✓ | Respondent is RESTRAINED from making any attempts to keep under surveillance petitioner, ~~petitioner's spouse~~, and any minors named in the table on page one. |
| ✓ | Respondent is RESTRAINED from making any attempts to contact petitioner, ~~petitioner's spouse~~, and any minors named in the table on page one. |
| ✓ | Respondent is RESTRAINED from entering or being within __250 feet__ (distance) of petitioner's ☒ residence  ☒ place of employment  ☐ other: <br><br> ☐ The address is confidential ☒ Petitioner waives confidentiality of the address which is: <br> [REDACTED FOR PURPOSES OF THIS ORDER] |
| | Other: _____ |

ECF No. 84-4.  Mr. Merred's three children were listed on page one of the protection order, including his high-school-aged daughter, Alexa.[2]  On November 24, 2010, the protection order was extended through December 8, 2010.

On December 4, 2010, Dr. Cornu-Labat attended his son's high school basketball game at Quincy High School and sat on the south side of the bleachers near the top.  Across the gymnasium from him on the north side of the gymnasium was Alexa, who was keeping score for the Quincy varsity basketball teams.  During the basketball game, Mr. Merred, who was at

---

[2]  The Court utilizes Alexa's name rather than her initials because she is no longer a minor.  *See* Fed. R. Civ. P. 5.2(a)(3) (requiring a minor's initials to be used in court filings).

ORDER ~ 3

1  home, spoke to Alexa by phone and inquired whether Dr. Cornu-Labat was
2  at the game.  Alexa advised that he was and where he was sitting.  Mr.
3  Merred asked his daughter to give the phone to a school administrator;
4  she did so, and Mr. Merred informed the school administrator that there
5  was a protection order prohibiting Dr. Cornu-Labat from being within 250
6  feet of Mr. Merred's daughter.  The school official had another
7  individual approach Dr. Cornu-Labat and inform him of the phone call, its
8  substance, and Alexa's presence at the game.  Dr. Cornu-Labat was not
9  asked to leave, and he continued watching the basketball game.  Alexa
10  advised her phone over the phone that Dr. Cornu-Labat was still at the
11  game.

12      Mr. Merred then called 911 and advised that the "court order is 250
13  feet and he's closer than that" and "we have a restraining order.  I need
14  that to be enforced immediately."  Scully Decl., ECF No. 36 Ex. A.  Mr.
15  Merred also advised dispatch that his daughter had a copy of the
16  protection order with her.

17      Dispatch informed Officers Eric Bakke and Thomas Clark ("Officers"),
18  who were traveling in the same patrol vehicle, that Mr. Merred had called
19  911 advising that a protection order was being violated because his
20  daughter and the subject were both in the high school gymnasium.  Officer
21  Bakke asked dispatch to fax him a copy of the protection order, which
22  dispatch agreed to do.  Dispatch did not advise the Officers that Alexa
23  had a copy of the protection order.

24      After arriving at the high school, Officers Bakke and Clark talked
25  to Mr. Merred via speaker phone in their patrol vehicle.  Mr. Merred
26  advised them that his daughter Alexa was at the basketball game, that he

had spoken to her by phone, and that she had shared that Dr. Cornu-Labat was watching the game. Mr. Merred advised that he had a protection order that prohibited Dr. Cornu-Labat from being within 250 feet of Mr. Merred or his family or within 250 feet of a Merred family member's school. Mr. Merred also shared that Dr. Cornu-Labat had refused to leave the school when requested to do so by a school official because he was watching his son play basketball. The Officers asked Mr. Merred to contact Alexa and to have her meet them at the gymnasium lobby. Mr. Merred did not advise the Officers that Alexa had a copy of the protection order.

While waiting for Alexa, the Officers viewed the digital information relating to the terms of the protection order that was listed on their vehicle's Spillman computer equipment ("Spillman"). ECF Nos. 63 ¶ 5, 64 ¶ 4, & 84-9. The Spillman information stated in part, "THE SUBJECT IS REQUIRED TO STAY AWAY FROM THE RESIDENCE, PROPERTY, SCHOOL OR PLACE OF EMPLOYMENT OF THE PROTECTED PERSON OR OTHER FAMILY OR HOUSEHOLD MEMBER." ECF No. 63-1. Spillman's information erroneously expanded the scope of the protection order by including "schools" of Mr. Merred and his family or household members. The information on Spillman is inputted from the National Crime Information Center (NCIC) database—an official source of information used by police officers. Although printouts received from NCIC contain the following disclaimer, "WARNING - THE FOLLOWING IS AN NCIC PROTECTION ORDER RECORD. DO NOT SEARCH, DETAIN, OR ARREST BASED SOLELY ON THIS RECORD. CONTACT ENTERING AGENCY TO CONFIRM STATUS AND TERMS OF PROTECTION ORDER," ECF No. 84-5, the information on Spillman does not contain such a disclaimer.

ORDER ~ 5

After reviewing the Spillman information relating to the protection order, Officers Bakke and Clark spoke with Alexa. Alexa, who was seventeen years of age, provided her school identification card. ECF No. 91-1 at 14:12-22. Alexa advised the Officers that she saw Dr. Cornu-Labat arrive before the boy's varsity game, for which she was score keeping, and he sat on the south side of the bleachers to watch the basketball game. She told the Officers that when her father called she advised him that Dr. Cornu-Labat was present, she gave her phone to a school administrator as requested by her father, and that Dr. Cornu-Labat continued to watch the game after being approached by the school official. Alexa did not advise the Officers that she had a copy of the protection order, and the Officers did not ask her if she had a copy of the protection order. *Id.*

The Officers then approached Dr. Cornu-Labat and asked him to step outside to speak with them. Dr. Cornu-Labat complied. He advised the Officers that he knew the protection order was in place but that he was not aware when he arrived that Alexa was there. He did not dispute that he did not leave the school after being told that Alexa was present.

The Officers determined there was probable cause to arrest Dr. Cornu-Labat under RCW 10.14.170 for violating the protection order, and arrested him. ECF Nos. 63 ¶ 9, & 84-9. Dr. Cornu-Labat declined to write a statement at that time. Dr. Cornu-Labat was transported to the Quincy Police Department (QPD), where he was booked, issued a criminal citation, and released.

The next day Dr. Cornu-Labat returned to the QPD to advise that he did not believe that his conduct violated the protection order and showed

Officer Clark a copy of the protection order.  ECF Nos. 84-7 & 84-11. Officer Clark noted that the protection order listed Mr. Merred's children and inquired whether Dr. Cornu-Labat would like to prepare a statement that could be submitted to the court.  ECF No. 84-7.  Dr. Cornu-Labat declined.  Later that day, Officers Bakke and Clark prepared incident reports that were submitted to the Grant County Prosecuting Attorney on December 10, 2010.

The QPD received the protection order three days after the arrest, and the Officers reviewed the protection order.  The Officers did not change or supplement their incident reports.  At some point, the QPD requested that Sergeant Dan Dopps review Dr. Cornu-Labat's arrest. Sergeant Dopps concluded that the arrest was valid given that the protective order prohibited Dr. Cornu-Labat from coming within 250 feet of Mr. Merred and his children:  Sergeant Dopps' reading of the protection order was erroneously expansive.  Chief Richard Ackerman then sent a letter to Dr. Cornu-Labat advising him that the Department determined that the Officers acted lawfully because the protection order prohibited Dr. Cornu-Labat from being within 250 feet of the protected persons.  Again, this was an erroneously expansive reading of the protection order.  Ultimately, the Grant County Prosecutor's Office dismissed the charge against Dr. Cornu-Labat.

On December 8, 2010, the Grant County District Court entered an amended protection order that extended the protection order to December 8, 2011, and allowed Dr. Cornu-Labat to enter the QVMC to receive medical treatment for himself or family members.  ECF No. 84-10.  The protection order expired on December 8, 2011.

ORDER ~ 7

On February 25, 2011, Dr. Cornu-Labat filed this lawsuit against Mr. Merred,[3] Officers Bakke and Clark, and Quincy.  ECF No. 1.  Later, Dr. Cornu-Labat added claims against the Grant County Sheriff's Office.  ECF No. 73.  In regard to Officers Bakke and Clark and Quincy (collectively, "Quincy Defendants"), Dr. Cornu-Labat alleges the following claims: 1) 42 U.S.C. § 1983 based on a violation of his Fourth Amendment rights, 2) false arrest and false imprisonment, 3) outrage, 4) defamation, 5) false light, 6) malicious prosecution, and 7) negligence.  *Id.*

In May 2012, the instant summary judgment motions were filed:  1) the Quincy Defendants' Motion for Summary Judgment, ECF No. 60, and 2) Dr. Cornu-Labat's Motion for Partial Summary Judgment, ECF No. 82.  A hearing occurred on July 31, 2012, in Richland.  Dr. Cornu-Labat was present, represented by Keith Scully.  Jerry Moberg appeared on the Quincy Defendants' behalf, and Michael McFarland appeared on the Grant County Sheriffs Office's behalf.  After reviewing the record and relevant authority and hearing from counsel, the Court is fully informed.  This Order supplements and memorializes the Court's oral rulings.

**B.   Standard**

Summary judgment is appropriate if the record establishes "no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The party opposing summary judgment must point to specific facts establishing a genuine

---

[3]  On March 27, 2012, the Court found that RCW 4.24.510 provided Mr. Merred immunity for his December 4, 2010 statements to law enforcement and school officials.  ECF No. 44.

ORDER ~ 8

issue of material fact for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986).  If the nonmoving party fails to make such a showing for any of the elements essential to its case for which it bears the burden of proof, the trial court should grant the summary judgment motion. *Celotex Corp.*, 477 U.S. at 322.

**C.   Authority and Analysis**

Dr. Cornu-Labat asks the Court to find in his favor on the issues of liability in his first (§ 1983) and second (false arrest/imprisonment) claims.  The Quincy Defendants oppose his motion and also separately ask the Court to dismiss:  1) the § 1983 claim because Officers Bakke and Clark had probable cause to arrest Dr. Cornu-Labat, or because they are entitled to qualified immunity given that they reasonably concluded that they had probable cause to arrest him; 2) the § 1983 claim against Quincy because there is no evidence that it had a policy or custom that deprived Dr. Cornu-Labat of his civil rights; 3) all claims against the Officers because RCW 26.50.140 grants police officers immunity from civil liability when arresting a person for violation of a protection order; and 4) the claims for false arrest/imprisonment and malicious prosecution because probable cause to arrest and prosecute Dr. Cornu-Labat existed, and the charging decision was made by the Grant County Prosecuting Attorney.[4]  The Court addresses each argument in turn.

---

[4] If the federal claims are dismissed, the Quincy Defendants ask the Court to decline supplemental jurisdiction over any remaining state-law claims.

ORDER ~ 9

1    **1.    42 U.S.C. § 1983 Claims**

2        **a.   Officers**

3        Dr. Cornu-Labat seeks relief against Officers Bakke and Clark for

4   violating his Fourth Amendment right to be free from unreasonable seizure

5   by arresting him without probable cause.  42 U.S.C. § 1983[5]; *see Buckley*

6   *v. City of Redding*, 66 F.3d 188, 190 (9th Cir. 1995).  It is undisputed

7   that the Officers acted under color of law; therefore, the key issue is

8   whether probable cause to believe that Dr. Cornu-Labat violated the

9   protection order existed, or whether a reasonable officer would believe

10  that such probable cause existed.  *See Mustafa v. City of Chicago*, 442

11  F.3d 544, 547 (7th Cir. 2006) (recognizing that an arrest, i.e., seizure,

12  is reasonable if supported by probable cause).

13       To evaluate whether Officers Bakke and Clark had probable cause to

14  arrest Dr. Cornu-Labat for violating the protection order, the Court

15  considers the "nature and trustworthiness of the evidence of criminal

16  conduct available" to the Officers.  *Beier v. City of Lewiston*, 354 F.3d

17  1058, 1064 (9th Cir. 2004).  If "the facts and circumstances within" the

18  Officers' "knowledge and of which they [had] reasonably trustworthy

19  ─────────────────────

20       [5] Section 1983 provides:

21           Every person who, under color of any statute,
             ordinance, regulation, custom, or usage, of any
22           State . . . subjects, or causes to be subjected,
             any citizen . . . to the deprivation of any rights,
23           privileges, or immunities secured by the
             Constitution and laws, shall be liable to the party
24           injured in an action at law, suit in equity, or
             other proper proceeding for redress . . . .
25

26  42 U.S.C. § 1983.

ORDER ~ 10

information [are] sufficient to warrant a prudent man in believing" that Dr. Cornu-Labat violated the protection order, then the Officers had probable cause to arrest.  *Id.* (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)).

Officers Bakke and Clark knew that Dr. Cornu-Labat continued to stay in the gymnasium after being told by a school official that Alexa was also in the gymnasium.  Based on the information about the protection order's terms given to them by Mr. Merred and Spillman, the Officers believed that Dr. Cornu-Labat was violating the protection order by being within 250 feet of Alexa's school.  All parties agree, however, that the protection order did not prohibit Dr. Cornu-Labat from being within 250 feet of Alexa's school.  Notwithstanding the Officers' erroneous expansion of the protection order,[6] the Court concludes the Officers had

---

[6]   The Quincy Defendants argue that the erroneous expansion of the protection order was a mistake of fact, and not a mistake of law.  The Court disagrees.  *See Beier*, 354 F.3d at 1071-72 (recognizing the distinction between a mistake of law and mistake of fact:  a mistake of law cannot create probable cause, whereas an officer's good-faith reliance on erroneous facts may establish probable cause).  This was a mistake of law because the erroneous information impacted whether Dr. Cornu-Labat's conduct constituted a violation of law, i.e, whether being within 250 feet of the school and/or Alexa violated the protection order. *See id.* at 1065-66 ("The facts in *Alford* [*v. Haner*, 333 F.3d 972 (9th Cir. 2003),] aptly illustrate the principle that probable cause does not exist where a police officer arrests an individual for activities that

ORDER ~ 11

probable cause to arrest Dr. Cornu-Labat under the actual terms of the protection order.

The protection order prohibited Dr. Cornu-Labat from 1) attempting to keep Alexa under surveillance, and 2) attempting to contact Alexa. There was no information before the Officers that Dr. Cornu-Labat violated the protection order by attempting to contact Alexa. However, the facts before the Officers were sufficient to support a probable cause determination that Dr. Cornu-Labat attempted to keep Alexa under surveillance. The Officers knew that Dr. Cornu-Labat could clearly view Alexa from his location in the gymnasium and that he refused to leave after learning that she was present. Accordingly, the Court finds probable cause to arrest Dr. Cornu-Labat existed under the surveillance section of the protection order.

As the Washington legislature recognized by granting immunity under RCW 26.50.140 to an officer who enforces a protection order, an important public policy is served when an officer enforces a protective order. An officer responding to a call to enforce a protection order generally does

do not constitute a violation of law."); *cf. Rohde v. City of Roseburg*, 137 F.3d 1142, 1144-45 (9th Cir. 1998) (holding that an officer's good-faith reliance on erroneous facts contained in a police report, i.e., that the vehicle was reported stolen, was a mistake of fact that did not vitiate the finding of probable cause). Although a mistake of the law cannot create probable cause, the Court nonetheless finds that probable cause to arrest Dr. Cornu-Labat existed under the protection order's surveillance section.

ORDER ~ 12

not know the nature and degree of conduct that supported the issuance of the protection order.  Enforcement of the protection order reduces the level of tension and violence that may arise to law enforcement, the public, and the individual(s) protected by the protection order. Although there is no evidence that violence was a concern on the evening of December 4, 2010, the Officers had probable cause to arrest Dr. Cornu-Labat for violating the protection order's surveillance prohibition.

Alternatively, if probable cause to arrest Dr. Cornu-Labat for violating the protection order's surveillance section did not exist, the Court finds Officers Bakke and Clark are entitled to qualified immunity based on their reliance on erroneous information.  Here, the qualified-immunity analysis therefore focuses on whether it was "objectively reasonable for the [O]fficers to believe [given the knowledge that they had at that time] that there was probable cause to arrest" Dr. Cornu-Labat for violating the protection order when they did not review a copy of it before arresting him.  *Brier*, 354 F.3d at 1068.

Case law clearly establishes that law enforcement has a "responsibility to familiarize themselves with [a protection] order's precise contents through some official source."  *Id.* at 1069; *see also Guerra v. Sutton*, 783 F.2d 1371, 1375 (9th Cir. 1986) (Officers have a "duty to inquire as to the nature and scope of the warrant."). Dr. Cornu-Labat argues that Officers Bakke and Clark could not make an objectively reasonable probable-cause determination without reviewing the protection order.  Based on the circumstances before the Officers that evening, the Court finds otherwise.

ORDER ~ 13

1    Unlike the officers in *Brier*, Officers Bakke and Clark took steps
2  to ascertain the terms of the protection order by turning to an official
3  police source of information: Spillman.  Unfortunately, Spillman
4  provided the Officers with incorrect information about Dr. Cornu-Labat's
5  ability to be within 250 feet of Alexa and her school.  And Dr. Cornu-
6  Labat did not advise the Officers before his arrest that he believed the
7  protection order did not proscribe his conduct that evening; it was not
8  until the next day that Dr. Cornu-Labat advised Officer Clark that he
9  believed the protection order did not prohibit his conduct the prior
10  evening.  *Cf. Rohde*, 137 F.3d at 1143 (noting the officers investigated
11  the stolen vehicle report further after the suspect advised that the
12  vehicle was not stolen).  Accordingly, before arresting Dr. Cornu-Labat,
13  Officers Bakke and Clark were not on notice that the consistent
14  information they had received from Spillman and Mr. Merred regarding the
15  protection order's application to Dr. Cornu-Labat's presence at Alexa's
16  school might have been erroneous.  The Officers therefore had no reason
17  to question the erroneous information they had received from an official
18  police source (Spillman), and they reasonably relied on it to base their
19  probable-cause determination.

20    Therefore, under the circumstances, the Court finds the Officers
21  fulfilled their clearly-established "responsibility to familiarize
22  themselves with the order's precise contents through some official
23  source." *Brier*, 354 F.3d at 1069.  That the information on Spillman
24  erroneously described the terms of the protection order was no fault of
25  the Officers, and without any dispute by Dr. Cornu-Labat or another
26  individual that evening as to whether the protection order prohibited Dr.

Cornu-Labat's presence at Quincy High School, the Court finds the Officers' conduct was objectively reasonable and they are entitled to qualified immunity. *See United States v. Butler*, 74 F.3d 915, 920 (9th Cir. 1996) (requiring the court to look at totality of the circumstances known to the officers at the time the probable-cause determination was made).

Accordingly, because probable cause to arrest existed and, alternatively, the Officers are entitled to qualified immunity, Dr. Cornu-Labat's § 1983 claim against the Officers is dismissed. Dr. Cornu-Labat's motion is denied in this regard, and the Quincy Defendants' motion is granted in this regard.

### b.  Quincy

Dr. Cornu-Labat argues that Quincy is liable under § 1983 because it failed to train its officers regarding the interpretation and enforcement of protection orders. Quincy seeks summary judgment in its favor as to this claim because there is no evidence that it made a deliberate or conscious choice to fail to train its officers about interpreting and enforcing protection orders.

Although the Officers, Sergeant Dopps, and Chief Ackerman all erroneously interpreted the protection order as prohibiting Dr. Cornu-Labat from being within 250 feet of Alexa and/or her school, the Court finds no triable issue of fact as to whether Quincy deliberately failed to adequately train its officers as to how to interpret and enforce protection orders. *See City of Canton v. Harris*, 489 U.S. 378, 388-89 (1989) (setting forth failure-to-train standard). Officer Clark provided Dr. Cornu-Labat an opportunity to prepare a statement that could be

presented to the Grant County Prosecuting Attorney and state court on two occasions.   Sergeant Dopps recognized in his report to Chief Ackmeran that Dr. Cornu-Labat had a valid argument pertaining to the protection order's omission of "school."   And Chief Ackerman encouraged Dr. Cornu-Labat to address his concerns with the court.   These comments indicate that the QPD took Dr. Cornu-Labat's concerns seriously.   Accordingly, even though the QPD erroneously interpreted the protection order by expanding it to prohibit Dr. Cornu-Labat from being within 250 feet of Alexa and/or her school, the Court concludes that the evidence is insufficient to establish a triable issue as to whether Quincy deliberately failed to adequately train its officers as to protection orders.   The Quincy Defendants' motion is granted in this regard.

**2.   State Law Claims**

**a.   Probable Cause**

Consistent with the Court's ruling that the Officers had probable cause to arrest Dr. Cornu-Labat, the Court dismisses Dr. Cornu-Labat's claims for false arrest, false imprisonment, and malicious prosecution because probable cause is a complete defense to these claims.   *See Hanson v. City of Snohomish*, 121 Wn.2d 552, 558 (1993) (recognizing that probable cause is a complete defense to claims of false arrest, false imprisonment, and malicious prosecution).   Dr. Cornu-Labat's motion is denied in this regard, and the Quincy Defendants' motion is granted in this regard.

**b.   Malicious Prosecution**

The Court also dismisses Dr. Cornu-Labat's malicious prosecution claim against the Quincy Defendants because the decision to charge Dr.

1  Cornu-Labat was made by the Grant County Prosecutor's Office, not the
2  Officers or Quincy.  *See id.* (setting forth malicious prosecution
3  elements).  The Quincy Defendants' motion is granted in this regard.

4          **c.  RCW 26.50.140 Immunity**

5      Officers Bakke and Clark also argue they are immune from all civil
6  liability under RCW 26.50.140.  Dr. Cornu-Labat responds that this state
7  statute is preempted by 42 U.S.C. § 1983, and there is a factual question
8  as to whether the Officers acted in good faith and without malice.

9      Washington law states, "No peace officer may be held criminally or
10 civilly liable for making an arrest under RCW 26.50.110 if the police
11 officer acts in good faith and without malice."  RCW 26.50.140.  Although
12 Washington may limit liability under state-law claims, this state statute
13 may not limit Congress' authority to provide relief under 42 U.S.C. §
14 1983 to an individual whose federal rights were violated by an individual
15 acting under color of state law.  *See Haywood v. Drown*, 556 U.S. 729,
16 736-37 (2009) (finding that New York's statute ran "contrary to Congress'
17 judgment that *all* persons who violate federal rights while acting under
18 color of state law shall be held liable for damages").  Accordingly, Dr.
19 Cornu-Labat permissibly seeks relief under § 1983.  However, as is
20 explained above, his § 1983 claim is dismissed because the Officers had
21 probable cause to arrest and, alternatively, are entitled to qualified
22 immunity.

23     In regard to Dr. Cornu-Labat's state-law claims against the
24 Officers, RCW 26.50.140 protects Officers Bakke and Clark from liability
25 if they "act[ed] in good faith and without malice."  The Court finds
26 there is no evidence submitted to establish a triable issue of fact as

ORDER ~ 17

1   to any bad faith or malice by the Officers.  The submitted evidence shows

2   that the Officers relied on the unchallenged information received from

3   Spillman and the Merreds, and when Dr. Cornu-Labat brought his concerns

4   to the QPD's attention, the QPD reviewed the incident. Accordingly, the

5   Court finds the Officers are immune from all liability arising from the

6   arrest of Dr. Cornu-Labat.  Dr. Cornu-Labat's motion is denied in this

7   regard, and the Quincy Defendants' motion is granted in this regard.

8   **D.   Conclusion**

9       For the above-given reasons, **IT IS HEREBY ORDERED**:

10      1.   The Quincy Defendants' Motion for Summary Judgment, **ECF No. 60,**

11  is **GRANTED**.  At the close of this case, judgment will be entered in the

12  Quincy Defendants' favor.

13      2.   Plaintiff's Motion for Partial Summary Judgment, **ECF No. 82**,

14  is **DENIED.**

15      **IT IS SO ORDERED.**  The District Court Executive is directed to enter

16  this Order and provide copies to counsel.

17      **DATED** this ___2nd___ day of August 2012.

18

19      _____S/ Edward F. Shea_____
                    EDWARD F. SHEA
20          Senior United States District Judge

21  Q:\EFS\Civil\2011\0080.msj.quincy.lc1.wpd

22

23

24

25

26

ORDER ~ 18